<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **EMERALD INVESTORS TRUST,** | **02-CV-1939 (WJM)** |
| **Plaintiff,** | |
| **v.** | **OPINION** |
| **GAUNT PARSIPPANY PARTNERS; 119 CHERRY HILL ASSOCIATES, L.L.C.; 99 CHERRY HILL ASSOCIATES, L.P.; HORSEHEADS COMMERCIAL DEVELOPMENT PARTNERS, L.P.; RECKSON OPERATING PARTNERSHIP, L.P.; and JOHN DOES 1 THROUGH 10;** | **HON. WILLIAM J. MARTINI** |
| **Defendants.** | |

Kenneth L. Leiby, Jr., Esq.
Shackleton & Hazeltine
159 Millburn Investors Trust
Millburn, NJ 07041-1849

    *(Attorney for Plaintiff)*

Michael A. Spero, Esq.
McCarthy and Schatzman, P.A.
731 Alexander Road
Princeton, NJ 08540

Philip R. Sellinger, Esq.
Greenberg Traurig, LLP
P.O. Box 677
200 Campus Dr.
Florham Park, NJ 07932-0677

    *(Attorney for Defendants)*

## INTRODUCTION

This matter having come before the Court upon the Complaint of Emerald Investors Trust ("Emerald") seeking to recover monies on a pair of unpaid promissory notes that came due in December 1999 and which are secured by a pair of corresponding mortgages; and this Court having conducted a bench trial as to all issues beginning on January 18, 2005 and ending on January 19, 2005 and having heard further oral argument on April 19, 2005; the following constitutes the Court's findings of fact and conclusions of law regarding Emerald's complaint.

## I.     PARTIES AND JURISDICTION[1]

1.     Plaintiff Emerald was, at the time of the April 2002 filing of the Complaint, an unincorporated business trust having as its trustee an individual citizen of Florida and as its sole beneficiary Emerald Investors Trust Ltd., a corporation incorporated in the British Virgin Islands and having its principle place of business there as well.  (*See* Decl. of Kenneth L. Leiby ¶ 3; Decl. of R. John Usher.)  Defendants have conceded that no Defendant was, at the time of the filing of the Complaint, a citizen of the British Virgin Islands for purposes of this Court's diversity jurisdiction.  (*See* Trans. of April 19, 2005 Oral Argument at 8:22–9:14.)

2.     Defendant Gaunt Parsippany Partners ("GPP"), a general partnership, was merged into Defendant 119 Cherry Hill Associates, L.L.C. prior to the April 2002 filing of the Complaint.  (*See* Decl. of Joel Hoffman ¶ 5.)

3.     Defendant 119 Cherry Hill Associates L.L.C. ("119 CHA"), a limited liability company, ceased to exist prior to the April 2002 filing of the Complaint.  (*See id.* ¶ 6.)

4.     Defendant 99 Cherry Hill Associates, L.P. ("99 CHA"), a limited partnership, was merged into Defendant Horseheads Commercial Development Partners, L.P. prior to the April 2002 filing of the Complaint. (*See id.* ¶¶ 3, 7.)

5.     Defendant Horseheads Commercial Development Partners, L.P. ("Horseheads") was a limited partnership at the time of the filing of the Complaint.  Its sole general partner was

---

[1]     By Order dated February 7, 2005, the Court directed the parties to appear before it and present evidence regarding their citizenship.  A telephone conference was held February 14, 2005 and it was agreed that counsel would submit affidavits regarding the citizenship of the parties, which they did on March 7, 2005.  The Court heard oral argument regarding the citizenship of the parties and the Court's diversity jurisdiction in light of the affidavits on April 19, 2005 and received further briefing on the issue shortly thereafter.  The Court's factual findings regarding citizenship are drawn from these post-trial submissions, and as indicated in this Opinion the Court is satisfied that diversity jurisdiction exists in this case.

Horseheads Commercial Development, Inc., a New York corporation.  Its sole limited partner was Stratford Business Associates, L.P., a limited partnership having as its general partner Cannon Street Properties L.L.C. (itself a limited liability company having the New Jersey citizens Mitchell Wolff ("Wolff") and Joel Hoffman ("Hoffman") as its sole members) and as its sole limited partners Wolff and Hoffman.  (*See id*. ¶¶ 3.)

6.      Defendant Reckson Operating Partnership, L.P. ("Reckson") was a limited partnership at the time of the filing of the Complaint.  Its sole general partner was Reckson Realty Corp., a Maryland corporation with its principal place of business in New York.  None of its limited partners were citizens of the British Virgin Islands.  (Cert. of Karen Pollinger ¶ 5; Trans. of April 19, 2005 Oral Argument at 8:22–9:14.)

7.      Given the citizenship of the parties and the fact that the amount in controversy in this case exceeds $75,000, the Court concludes, as set forth further herein, that it has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

## II.      FINDINGS OF FACT

### A.      The Operative Notes, Mortgages, and Related Agreements

8.      The instant dispute concerns Emerald's rights under a pair of promissory notes and mortgages issued to Newby Toms ("Toms") in 1994 and assigned to Emerald in early 1998.  As the following discussion of the operative documents indicates, Emerald's rights under the relevant notes and mortgages were modified by other agreements.  Given the complicated interplay between these other agreements and the notes and mortgages, the Court will briefly describe here the relevant transactions and agreements as well as those portions of the operative documents relevant to this dispute.  To summarize the relevant effect of the agreements, however, the Court notes briefly that under the operative documents Emerald was entitled to recover $583,333.33 on each of its notes and to obtain foreclosure on the mortgages securing the notes if the following occurred: (1) Defendants[2] breached the Mortgage Modification Agreements; (2) the senior mortgages to which Emerald's mortgages were subordinated and the other mortgages in parity with Emerald's mortgages (that is, Hoffman's and Wolff's mortgages) ceased to have any relevance; and (3) nothing was paid on the notes after they came due in December 1999.  All these conditions, as explained in this Opinion, indeed came to pass.

---

[2]      For ease of reference, the Court refers to the parties in breach of the Mortgage Modification Agreements as "Defendants" in this Opinion.  The Court recognizes, however, that the original parties to these agreements were GPP, 99 CHA, and their partners—Toms, Hoffman, and Wolff.  As a result of the 1998 mergers of GPP into 119 CHA and 99 CHA into Horseheads (*see infra* ¶ 16), the parties in actual breach of the MMAs appear to have been Horseheads and 119 CHA.

9.      In mid-1986, GPP—whose partners at the time were Toms, Wolff, and Hoffman—acquired title to the property known as 119 Cherry Hill Road and subsequently mortgaged the property.  (*See* Stipulated Facts ¶¶ c, g.)[3]  In early 1987, 99 CHA—which also had Toms, Wolff, and Hoffman as its  partners at the time—acquired title to the property known as 99 Cherry Hill Road and also subsequently mortgaged the property.  (*See id.* ¶¶ f, h.)  Both properties were located in Parsippany, New Jersey and consisted of office buildings and land in office parks.  (*See id.* ¶ I.)

10.     In January 1994, the mortgages on both properties were refinanced with the United Bank of Kuwait ("UBK"), which was accomplished in part by increasing debt on property owned by Horseheads, another Toms/Wolff/Hoffman partnership.  (*See id.* ¶¶ j–k; Jan. 18, 2005 Tr. Trans. at 31:23–32:24.)  In conjunction with the refinancing, Toms, Wolff, and Hoffman agreed that GPP and 99 CHA would give each of them a note for $333,333.33 secured by a mortgage (subordinate to UBK's senior mortgage) on either the 99 Cherry Hill Road or 119 Cherry Hill Road property.  (*See* Pltf.'s Tr. Exhs. P1–P2, P35–36; Jan. 18, 2005 Tr. Trans. at 30:17–7, 31:23 –32:24, 57:8–10 (indicating that Hoffman, Wolff, and Toms negotiated the terms of the 1994 notes and mortgages and that Toms was the principal drafter of the documents); *id.* at 84:18–85:7, 102:14–104:29 (indicating Hoffman's lack of specific recollection regarding the making of the notes and mortgages); Jan. 19, 2005 Tr. Trans. at 6:23–7:3, 8:19–9:4 (indicating that counsel for GPP and 99 CHA had discussions with Toms, Wolff, and Hoffman regarding the notes and mortgages).)  The notes bore a 12% annual rate of interest and were due and payable on December 31, 1999.  (*See* Stipulated Facts ¶¶ j–k; Pltf.'s Tr. Exhs. P1–P2.)  According to the pleadings, each note was given for valuable consideration (Compl. ¶¶ 14, 17; Answer ¶¶ 14, 17), an undisputed allegation corroborated by the testimony of Frank McGowan ("McGowan"), an attorney for GPP, 99 CHA, Toms, Hoffman, and Wolff having knowledge of the 1994 refinancing.  McGowan indicated that the notes memorialized the transfer of moneys from Toms, Hoffman, and Wolff to the properties.  Specifically, McGowan testified that the 1994 refinancing was structured such that money flowed from UBK to Horseheads' limited partners—Toms, Hoffman, and Wolff—and then from them to GPP and 99 CHA.  (*See* Jan. 19, 2005 Tr. Trans. at 7:5–11, 33:23–34:19.)  This is consistent with recitations contained in Second Mortgage Parity Agreements, entered into in conjunction with the 1994 refinancing, stating that "[e]ach Partner will fund a second mortgage loan . . . to the [GPP or 99 CHA partnership] in the amount of $333,333.33."  (*See* Pltf.'s Tr. Exhs. P3–P4.)  McGowan's testimony is also consistent with testimony by Toms and Hoffman indicating that Toms gave his consent to increase the debt on Horsehead's property only because the refinancing was structured such that the notes and mortgages were issued to the partners.  (*See* Jan. 18, 2005 Tr. Trans. at 31:23–32:24, 35:15–17, 84:15–24.)

11.     In conjunction with the making of the January 1994 promissory notes and subordinate

---

[3]      Stipulated facts are found in Divider #3 of the Final Pre-Trial Order.

mortgages on both properties, Toms, Wolff, and Hoffman entered into Second Mortgage Parity Agreements providing that each partner ranked equally in payment or security on the loans evidenced by the notes and secured by the mortgages.  (*See* Stipulated Facts ¶ m; Pltf.'s Tr. Exhs. P3–P4.)

12.     In 1996 and 1997 negotiations took place regarding the buyout of Toms' interests in GPP, 99 CHA, and Horseheads.  (*See* Jan. 18, 2005 Tr. Trans. at 35:15–23.)  As a result of the negotiations, in February 1997 the parties modified the notes and mortgages so that the principal sum due on each note (each of which, again, was secured by the 99 Cherry Hill Road or 119 Cherry Hill Road properties) increased from $333,333.33 to $583,333.33. This is reflected in the several First Amendment to Note and First Amendment to Mortgage documents.  (*See* Pltf.'s Tr. Exhs. P5–P8.)

13.     At the same time, however, GPP and 99 CHA entered into Mortgage Modification Agreements (referred to as the "MMAs" for the remainder of this Opinion) with Toms, Wolff, and Hoffman that rendered the notes non-interest bearing, reduced their face values from $583,333.33 to $250,000.00, and provided for repayment thereon only, in relevant part, to the extent of that any refinancing or sale of the properties resulted in any "net proceeds."  (*See* Pltf.'s Tr. Exhs. P32–P33, § 1.)  However, the MMAs provided that these modifications would be of no force or effect if Toms was not paid $20,958.25 on (or within five days of) February 7, 997, August 1, 1997, July 1, 1998, and again on April 1, 1999.  (*See id*. §§ 2, 3(a)  More importantly, however, the continued relevance of these modifications was premised on the agreement, set forth in the MMAs, that each note holder would be entitled, when the notes came due in December 1999, to payment out of the net proceeds of any sale of the properties prior to December 1999:

> (a) *Subject to the respective terms and conditions of this Agreement*, *the Notes, the Mortgages*, the Subordination Agreement and the Parity Agreement *and* for the consideration set forth in paragraph 2 hereinbelow [specifically, the Mortgagors' Prepayment obligations], *but* specifically subject to paragraph 3 below [that is, Mortgagors' default on its Prepayment obligations], each Mortgagee and the Mortgagor hereby agree to modify each of the Notes . . . .
>
> (iv) [such that n]o payments shall be due under any Notes except for . . . payments in the amount of the entire net proceeds of any refinancing of the mortgage indebtedness of Mortgagor or of any sale of some or all of its assets.
>
> . . . .
>
> (b) Except as specifically modified pursuant hereto, all of the terms, conditions and agreements in the Notes and Mortgages [including, necessarily, the Mortgagors' obligation to make payment on the notes when they came due in December 1999] are acknowledged, confirmed and ratified by each Mortgagee and the Mortgagor and shall remain in full force and effect.

(*See id*. § 1(a)(iv) (emphases added).)

14. Also at the same time, each mortgage given to Toms, Wolff, and Hoffman was made subject to Subordination Agreements dated February 7, 1997, which replaced the original 1994 subordination agreements. (*See* Stipulated Facts ¶ r.) These agreements, made among Toms, Wolff, Hoffman, GPP, 99 CHA, and UBK, effectively provided that Toms, Wolff, Hoffman would not be entitled to the proceeds from the sale of any assets of GPP or 99 CHA "until the Senior Mortgage [held by UBK] shall have been paid in full." (*See* Defts.' Tr. Exhs. D7–D8, at ¶ 7.) Importantly, the subordination agreements nowhere defined what it meant to be "paid in full." The agreements also provided that "[t]he Subordinate Lender [Toms] agrees not to bring any action to foreclose the Subordinate Mortgage . . . without the express written consent of the Senior Lender [which entity the agreements expressly define as the "holder of certain mortgages"]." (*See* Defts.' Tr. Exhs. D7–D8, at ¶¶ C, 2.)

15. In August 1997 Toms assigned his notes and mortgages, as amended and modified, to Emerald. (*See* Pltf.'s Tr. Exhs. P9–P10.)

**B.   The August 1998 Sale of the 99 Cherry Hill Road and 119 Cherry Hill Road Properties**

16. Prior to the sale of the 99 Cherry Hill Road and 119 Cherry Hill Road properties, GPP merged with 119 CHA, with 119 CHA being the surviving entity. Also, 99 CHA merged with Horseheads, with Horseheads being the surviving entity. (*See* Stipulated Facts ¶¶ s–t.) Thus, 119 CHA and Horseheads assumed all of GPP and 99 CHA's rights and obligations under the various mortgages, notes, and agreements discussed *supra*.

17. In August 1998, Horseheads and 119 CHA conveyed the 99 Cherry Hill Road and 119 Cherry Hill Road properties to Reckson for a total $19,905,000.00. (*See* Stipulated Facts ¶ u.) The proceeds from the sale of the properties were accounted for on a closing statement. (*See* Pltf.'s Tr. Exh. P13; Defts.' Tr. Exh. D38; Jan. 18, 2005 Tr. Trans. 95:20–96:3.) It indicates that the proceeds were allocated as follows:

| | |
|---|---|
| [UBK] Mortgage Payment | ($15,750,000.00) |
| [UBK] Mortgage Interest (3/1/98 - 8/12/98) | ($709,664.95) |
| Real Estate Taxes (1Q, 2Q, period 7/1/98 - 8/12/98) and Interest Penalty thru 8/14/98 | ($208,415.40) |
| Sale Brokerage Fee | ($477,625.00) |
| New Jersey Real Property Transfer Tax | ($99,300.00) |
| Security Deposits | ($311,523.22) |
| Rent Credits to Purchaser (19 days - 8/13/98 to 8/31/98) | ($153,738.75) |
| Cash to Seller | ($950,003.24) |
| Escrow Account for Unpaid Broker's Fee | ($42,000.00) |
| Reckson Operating Units to Seller | ($1,202,729.44) |

18.    The stipulated facts as well as the documentary and testimonial evidence adduced at trial demonstrate that, under the transaction:

   a.    Wolff and Hoffman received the $1,202,729.44 representing "Reckson Operating Units to Seller," which they pledged to UBK to partially secure the deficiency between UBK's senior mortgage ($24,000,000.00) and the $16,459,664.95 UBK received in connection with the sale of the properties (*see* Stipulated Facts ¶ v);[4]

   b.    The $950,003.24 representing "Cash to Seller" was distributed to GPP and 99 CHA and ultimately distributed to general creditors (*see* Pltf.'s Tr. Exhs. P38–P39; Defts.' Tr. Exh. D37; Jan. 18, 2005 Tr. Trans. at 110:17–25, 111:5–11); Stratford Business Corporation, a corporation owned by Hoffman and Wolff, received $377,000 of this amount (Defts.' Tr. Exh. D37; Jan. 18, 2005 Tr. Trans. at 117:7–118:17);

   c.    The $42,000.00 representing "Escrow Account for Unpaid Broker's Fee" was distributed to a broker (for work unrelated to the sale of the relevant properties) and to counsel for GPP, 99 CHA, Hoffman, and Wolff (*see* Pltf.'s Tr. Exh. P37, at 47:24–49:1); and

   d.    The $465,261.97 representing "Security Deposits" and "Rent Credits to Purchasers" were credited to Reckson (*see* Defts.' Tr. Exh. D22 §§ 1.01(d), 7.01(a); Jan. 18, 2005 Tr. Trans. at 98:13–24).

19.    In connection with the transaction, UBK released its mortgage even though it was paid only $16,459,664.95 on its senior mortgages, which were worth approximately $24,000,000.00.  Specifically, UBK filed a "Satisfaction of Mortgage" identifying its mortgages as "Discharged of Record" as a result of having been "Paid and Satisfied." (*See* Pltf.'s Tr. Exhs. P18–P19.)  Wolff and Hoffmann released their mortgages as well by recording "Satisfaction[s] of Mortgage" identifying their mortgages as "Discharged of Record" as a result of having been "Paid and Satisfied."  (*See* Pltf.'s Tr. Exhs. P20–P23.) Toms, who got nothing from the sale, did not.  (*See* Jan. 19, 2005 Tr. Trans. at 29:5–30:7; Defts.' Tr. Exh. D56.)  Defendants acknowledge that, as a result, Hoffman and Wolff signed an indemnity agreement with Reckson's title insurer promising to indemnify it should any claims on the properties arise out of Toms' outstanding mortgages.  (*See* Jan. 18, 2005 Tr. Trans. at 120:13–18; Defts.' Tr. Exh. D45.)

   **C.    Defendants Failed to Satisfy Their Prepayment Obligations Under the MMAs**

20.    It is undisputed that by April of 1999 the Prepayment Installments due to Toms/Emerald

---

[4]    UBK also accepted personal guarantees from Wolff and Hoffmann as well as a lien and mortgage on real property owned by Horseheads to satisfy the deficiency.  (*See* Defts.' Tr. Exh. D56.)

under the MMAs on or around February 7, 997, August 1, 1997, and July 1, 1998 had been timely made. (*See* Stipulated Facts ¶¶ o, q.)  The checks for the Prepayment Installment due on April 1, 1999, however, were not sent to Emerald until April 26, 1999 and were dishonored when Emerald attempted to deposit them in June 1999. (*See id*. ¶¶ w–x.)

### D. Emerald Has Never Been Paid Anything On Its Notes

21.    Although Emerald's notes came due December 31, 1999 (*see* Pltf.'s Tr. Exhs. P1–P2) and despite the fact, as discussed *infra*, that Defendants realized net proceeds from the 1998 sale of the properties securing the notes, it has been undisputed throughout this litigation that nothing was paid on them.

22.    On September 14, 2000, Emerald notified Defendants and UBK that it was calling the notes in default and demanded full payment on them.  (*See* Stipulated Facts ¶ y.)

23.    On or about April 23, 2002, Emerald, having not received any payment on the notes, initiated the instant action.  (*See id*. ¶ aa.)

## III.    CONCLUSIONS OF LAW

24.    At its core, this case concerns two partners' attempt to dispose of secured properties without the consent of their former partner despite their former partner's secured interests in the properties.  Unable to obtain Toms' consent to release his mortgages on the 99 Cherry Hill Road and 119 Cherry Hill Road properties, Wolff and Hoffman decided to take their chances that under the relevant agreements (specifically, the MMAs) they would owe nothing to Toms despite the properties' sale.  They therefore agreed to indemnify the title insurer on the transaction.  Hoffman and Wolff, however, miscalculated.  Under the MMA, Emerald was entitled to recover on its notes at least its share of the $2,659,994.65 in net proceeds from the sale of the properties.  However, Defendants having breached this and other obligations under the MMAs, the MMAs ceased to place any limitation on Emerald's rights under the notes and mortgages after December 1999.  Nor did the Subordination Agreements or Second Mortgage Parity Agreements continue to place any limitations on Emerald's rights under the notes and mortgages once UBK, Hoffman, and Wolff released their mortgages.  Thus, when the notes came due in December 1999 and nothing was paid, Emerald became entitled to recover on the terms stated on the faces of its notes and mortgages.

25.    Although the evidence in this case clearly establishes that Emerald is entitled to recover on its unpaid notes and to foreclose on its mortgages, Defendants present numerous arguments against the entry of judgment in Emerald's favor.  Defendants first argue: (a) that the Court lacks subject matter jurisdiction.  As to the merits, Defendants argue that Emerald is entitled to nothing on its notes and mortgages because: (b) Toms' gave

nothing in consideration for them; (c) the August 1998 sale resulted in zero net proceeds; (d) even if there were net proceeds, the Subordination Agreements bar recovery; (e) laches bars recovery; (f) the doctrine of unclean hands bars recovery; (g) there is no evidence in the record regarding the identity and existence of Emerald to substantiate its purported interest in this litigation; and (h) any judgment in favor of Emerald must be reduced consistent with the terms of the Second Mortgage Parity Agreements. (*See generally* Defendants' Brief on Subject Matter Jurisdiction [hereinafter "Defts.' SMJ Br."]; Defendants' Proposed Factual Findings and Conclusions of Law [hereinafter "Defts.' Prop. FF&CL"]; Defendants' Trial Brief [hereinafter "Defts.' Tr. Br."].)

### A.    The Court Has Subject Matter Jurisdiction Over This Action

26.    Defendants argue that this Court lacks subject matter jurisdiction over this dispute under 28 U.S.C. § 1332 given the New York citizenship of certain Defendants and because Emerald should be deemed a New York citizen. (*See generally* Defts.' SMJ Br.; Defts.' Prop. FF&CL at 12–13.)  Defendants base this contention on their reading of *Navarro Savings Ass'n v. Lee*, 446 U.S. 458 (1980), which they believe held that the citizenship of an unincorporated business trust like Emerald is determined by the citizenship of "the real party to the controversy"—specifically "the individual who is 'in control of the litigation,' as this is the party who 'will appear before the Court frequently and thus be in a position to generale or mitigate local bias." (Defts.' SMJ Br. at 5–6) (citations omitted).  This is not, however, a correct understanding of the law.

27.    The question before the Court in *Navarro* was whether "trustees of a business trust may invoke the diversity jurisdiction of the federal courts on the basis of their own citizenship, rather than that of the trust's beneficial shareholders." 446 U.S. at 458.  *Navarro* held no more than that the trustee of an unincorporated business trust may bring an action in his capacity as trustee*, without regard to the citizenship of the beneficiaries or shareholders of the trust*, where he is an active trustee—*i.e.*, a trustee who has legal title to trust assets, manages the assets, and controls the litigation. *Id.* at 455–56.  It did not, as Defendants contend, hold that in all cases the citizenship of an unincorporated business trust is to be determined by references to the citizenship of a "real party in interest" behind the trust. *See Carden v. Arkoma Assocs.*, 494 U.S. 185, 187 n.1 & 192–93 (1990) ("*Navarro* had nothing to do with the citizenship of the 'trust,' since it was a suit by the trustees in their own names.")  And *Navarro* certainly does not permit this Court to ignore the citizenship of trust beneficiaries in an action like this one that is brought by the trust itself.  *See Carden*, 494 U.S. at 195 (rejecting "the contention that to determine, for diversity purposes, the citizenship of an artificial entity, the court may consult the citizenship of less than all of the entity's members" and noting that the Court "adhere[s] to [its] oft-repeated rule that diversity jurisdiction in a suit by or against the entity depends on the citizenship of . . . the several persons composing such association") (citations and quotation marks omitted); *see also FMAC Loan Receivable Trust 1997-C v. Strauss*, No. 03-2190, 2003 WL 1888673, at *1 (S.D.N.Y. Apr. 14, 2003) (following rule that under *Navarro* and *Carden* the citizenship of a unincorporated business trust in whose name a

suit is brought is determined by reference to its beneficiaries).  The law of this Circuit is not to the contrary.  *Cf. Riverside Mem. Mausoleum, Inc. v. UMET Trust*, 581 F.2d 62, 65 (3d Cir. 1978) (looking, for purposes of diversity jurisdiction, to citizenship of all investors of unincorporated business trust).

28.   Because Emerald's sole beneficiary is a corporation incorporated in the British Virgin Islands and having its principle place of business there as well, it is clear that there are no jurisdictional problems in this case given that no Defendant may be considered a citizen of the British Virgin Islands.  (*See supra* ¶¶ 1–6.)

## B.   Emerald's Notes and Mortgages Are Not Invalid for Lack of Consideration

29.   Defendants argue that Emerald's notes and mortgages are invalid for lack of consideration because "Toms did not put any of his own money into the properties when he created the 1994 subordinate mortgages on 99 and 119 Cherry Hill Road."  (*See* Defts.' Prop. FF&CL at 1–3.)  However, Defendants have already admitted Emerald's allegations that "[o]n or about January 13, 1994, *for valuable consideration*, GPP [and 99 CHA] gave Newby Toms . . . . promissory note[s] in the principal sum of $333,333.33 [each], with interest at the rate of twelve (12%) per cent per annum to be paid on December 31, 1999 . . . ."  (*See* Compl. ¶¶ 14, 17; Answer ¶¶ 14, 17) (emphasis added).  There can be no dispute at this point, therefore, that the notes and mortgages were given for valid consideration.  *See* Fed. R. Civ. P. 8(d) ("Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied in the responsive pleading.");  *U.S. for the Use of "Automatic" Sprinkler Corp. v. Merritt-Chapman & Scott Corp.*, 305 F.2d 121, 123 (3d Cir. 1962) ("Since the Answer fails to deny the quoted allegations of the Complaint, they are deemed admitted.").

30.   Even if the Court were to ignore Defendants' admission,[5] the Court is satisfied that the evidence establishes that Toms gave consideration in exchange for the notes and mortgages.  Citing N.J.S.A. 12A:3-303(b)[6] and *Gerrold v. Penn Title Insurance Co.*, 637 A.2d 1293, 1295 (N.J. App. Div. 1994), Defendants contend specifically that Emerald's

_____

[5]      This argument was presented in Defendants' summary judgment papers, identified in the Final Pre-Trial Order, and made in Defendants' pre-trial and post-trial briefs, all of which may have preserved this affirmative defense even if Defendants' Answer admitted facts inconsistent with the pleading of this affirmative defense in the first place.  *See Charpentier v. Godsil*, 937 F.2d 859, 864 (3d Cir. 1991) ("It has been held that a defendant does not waive an affirmative defense if he raised the issue at a pragmatically sufficient time, and [the plaintiff] was not prejudiced in its ability to respond.") (citations and internal quotation marks omitted).

[6]      N.J.S.A. 12A:3-303(b) provides that "'[c]onsideration' means any consideration sufficient to support a simple contract."

Page 9 of  19

notes and mortgages are invalid because "in executing the mortgage documents . . . Toms . . . suffered no detriment to support consideration for a simple contract." (Defts.' Tr. Br. at 13.) This argument ignores, however, the testimonial and documentary evidence showing that the 1994 refinancing was structured such that money flowed from UBK to Horseheads' limited partners—Toms, Hoffman, and Wolff—and then from them to GPP and 99 CHA. Indeed, Toms gave his consent to the transaction (which called for increased debt on Horsehead's property) only because the refinancing was structured such that the notes and mortgages were issued to the partners. (*See supra* ¶ 10.)

31.     For these reasons, the Court finds that Emerald's notes and mortgages are not invalid for lack of consideration.

        **C.     The 1998 Sale of the 99 Cherry Hill Road and 119 Cherry Hill Road Properties Resulted In Net Proceeds**

32.     Emerald does not claim that the first five entries on the closing statement representing "Mortgage Payment," "Mortgage Interest," "Real Estate Taxes,""Sale Brokerage Fee," and "New Jersey Real Property Transfer Tax" constitute net proceeds under the MMAs. (*See* Plaintiff's Proposed Findings of Fact and Conclusions of Law at 5 [hereinafter "Pltf.'s Prop. FF&CL"].) Rather, it argues only that the monies identified in the last five entries—"Security Deposits," "Rent Credits to Purchasers," "Cash to Seller," "Escrow Account for Unpaid Broker's Fee," and "Reckson Operating Units to Seller"—constitute net proceeds that should have been distributed, pursuant to the MMAs, the mortgages, and the Second Mortgage Parity Agreements to Toms, Wolff, and Hoffman equally. (*See id.*)

33.     Defendants argue that there were no net proceeds from the sale of the properties because the $19,905,000 sale price did not cover UBK's $24,000,000 senior mortgages on the properties and because Messrs. Hoffman and Wolff walked away from the transaction with $8,900,000 in additional debt (that is, the $8,400,000 in additional mortgaged debt that was added to the Horseheads property in connection with the transaction and the $500,000 note that they personally guaranteed in UBK's favor), none of which Toms was required to assume. (*See* Defts.' Prop. FF&CL at 4–10.)

34.     Because the MMA does not define the term "net proceeds," it is important to note that under New Jersey law courts interpreting contract terms must give them their "plain and ordinary meaning." *Schor v. FMS Fin. Corp.*, 814 A.2d 1108, 1112 (N.J. App. Div. 2002). If the terms are clear, this Court must enforce the contract as written. *Graziano v. Grant*, 741 A.2d 156, 163 (N.J. App. Div.1999). Blacks's Law Dictionary defines "net proceeds" as "[t]he amount received in a transaction minus the costs of the transaction (such as expenses and commissions)." Black's Law Dictionary (8th ed. 2004). Similarly, the Dictionary of Finance and Investment Terms defines "net proceeds" as the "amount . . . . received from the sale or disposition of property . . . after deduction of all costs incurred

in the transaction."  Dictionary of Finance and Investment Terms 452 (6th ed. 2003).

35.     Thus, to determine whether the 1998 sale resulted in any net proceeds, the Court need
        only determine which items on the closing statement are properly excluded from the
        $19,905,000 sale price as "costs."  Black's defines "closing costs" in a real estate
        transaction as "[t]he expenses that must be paid . . . apart from the purchase price and
        interest."  Black's Law Dictionary.  Similarly, the Dictionary of Finance and Investment
        Terms defines "closing costs" in a real estate transaction as "expenses involved in
        transferring real estate from a seller to a buyer, among them lawyer's fees, survey
        charges, title searches and insurance, and fees to file deeds and mortgages."  Dictionary of
        Finance and Investment Terms 116.

36.     The Court is satisfied, based on these definitions and the evidence adduced at trial, that
        the $1,202,729.44 representing "Reckson Operating Units to Seller," the $950,003.24
        representing "Cash to Seller," the $42,000.00 representing "Escrow Account for Unpaid
        Broker's Fee," and the $465,261.97 representing "Security Deposits" and "Rent Credits
        to Purchasers" are not "costs" properly excluded from "net proceeds" but in fact
        constitute part of the "net proceeds" from the sale for purposes of the MMAs.  Although
        it may very well have been that the terms of the sale were dictated by UBK, this does not
        undermine the fact that UBK released its senior mortgages after accepting roughly
        $16,459,664.95 in connection with the sale.  After that happened, next in line to be paid
        were Wolff, Hoffman, and Toms, and Wolff and Hoffman also released their
        subordinated mortgages after receiving $1,202,729.44 in Reckson Common Units.
        Although Toms was a secured creditor entitled to be paid equally with Wolff and
        Hoffman after UBK released its mortgage, he got nothing.

37.     In sum, the Court finds that the 1998 sale of the 99 Cherry Hill Road and 119 Cherry Hill
        Road properties resulted in "net proceeds" totaling $2,659,994.65.  However, given
        Defendants' breach of the MMAs discussed more fully later in this Opinion, Emerald's
        recovery in this case is not restricted by the modifications stated therein limiting
        Emerald's recovery to its equal share of any net proceeds derived from the sale of the
        properties securing the notes.

        D.      The Subordination Agreements Do Not Bar Emerald's Recovery on the Notes
                and Mortgages

38.     Defendants maintain that the Subordination Agreements bar Emerald from recovering on
        the secured notes even if there were "net proceeds" from the 1998 sale of the 99 Cherry
        Hill Road and 119 Cherry Hill Road properties because: (1) UBK, the senior mortgage
        holder on the properties, was not "paid in full" as a result of the sale; (2) Emerald's
        recovery would be inconsistent with a provision in the Subordination Agreements stating
        that "[t]he Subordinate Lender . . . agrees . . . that the Subordinate Mortgage shall be
        subject and subordinate in lien to . . . all advances which may be made by the Senior

Lender pursuant to the Senior Mortgage to protect the security of the Senior Mortgage"; and (3) UBK never gave its express written consent to Emerald to seek foreclosure. (*See* Defts.' Tr. Br. at D8–D10; Defts.' Prop. FF&CL at 8–9.)

39.     The Court finds no merit to these arguments. First, that UBK was "paid in full" on its senior mortgages is clearly evidenced by the fact that UBK released its senior mortgages after having been paid roughly $16,459,664.95 in connection with the sale of the properties. (*See supra* ¶ 19.) Second, it is patently incomprehensible how Toms' entitlement under the MMAs to the same benefits as Wolff and Hoffman in connection with the 1998 sale of the 99 Cherry Hill Road and 119 Cherry Hill Road properties would endanger UBK's senior secured interest. Finally, because there were no longer any *senior* mortgages following UBK's release of its mortgages in connection with the sale and thus no longer any senior mortgages to which Toms' mortgages needed to be subordinated, the Subordination Agreements ceased to have any relevance following the 1998 sale. Indeed, nothing in the Subordination Agreements indicates that they would survive UBK's release of its senior mortgages. Therefore, Emerald did not need UBK's prior consent to seek foreclosure on its mortgages.

40.     For these reasons, the Court finds that the Subordination Agreements do not bar Emerald's recovery on its notes and mortgages.

### E.     Laches Does Not Bar Emerald's Recovery on the Notes and Mortgages

41.     Defendants argue that laches bars Emerald from obtaining an order of foreclosure on its notes and mortgages because Emerald did not call the subordinate mortgages in default until September 2000 and did not commence this action until April 2002. (*See* Defts.' Prop. FF&CL at 10; Stipulated Facts ¶ y.) Laches does not, however, provide any equitable defense in this case.

42.     Defendants raise the doctrine of laches only in opposition to the equitable remedy—foreclosure—sought by Emerald. *See Kopin v. Orange Prods., Inc.*, 688 A.2d 130, 140 (N.J. Appl. Div. 1997) (noting that "[t]he statute of limitations applies to legal actions while laches applies to equitable actions" ). Laches is defined as an "inexcusable delay in asserting a right," *Northwest Covenant Med. Ctr. v. Fishman*, 770 A.2d 233, 244 (N.J. 2001) (citations and quotation marks omitted), and the New Jersey Supreme Court has instructed that "[t]he primary factor to consider when deciding whether to apply laches is whether there has been a general change in condition during the passage of time that has made it inequitable to allow the claim to proceed." *Id*. In this case, Emerald's notes came due in December 1999, and Defendants have identified no "general change in condition" from this date to September 2000, when Emerald called the notes in default, warranting the application of laches.

43.     For these reasons, the Court finds that laches does not bar Emerald's entitlement to

foreclosure on its mortgages.

### F.     The Doctrine of Unclean Hands Does Not Bar Emerald's Recovery on the Notes and Mortgages

44.     Defendants argue that the doctrine of unclean hands bars Emerald's entitlement to the relief it seeks because Toms will be the true beneficiary of any judgment rendered herein, a fact not disclosed to the Court.  (*See* Defts.' Prop. FF&CL at 13–14.)  Although the parties' post-trial submissions clarify that Toms is not Emerald's beneficiary, the Court also notes that even if he were the doctrine of unclean hands would not for this reason bar Emerald's recovery.  The doctrine is intended to "give[] expression to the equitable principle that a court should not grant relief to one who is a wrongdoer *with respect to the subject matter in suit*."  *Faustin v. Lewis*, 427 A.2d 1105, 1107 (N.J. 1981) (emphasis added).  Defendants have identified no wrongdoing on Toms' part in connection with his taking of a secured interest in the 99 Cherry Hill Road and 119 Cherry Hill Road properties.  All they have done (other than claim that Toms has misrepresented his interested status to the Court) is suggest that Toms is somehow seeking to defraud other general creditors he may have through Emerald's enforcement of the notes and mortgages.  The Court will not deny Emerald judgment on the notes and mortgages based on this irrelevant speculation.

45.     For this reason, the Court finds that the doctrine of unclean hands does not bar Emerald's recovery on the notes and mortgages.

### G.     Emerald Has an Interest in This Litigation and Therefore Is a Proper Plaintiff

46.     Defendants argue that Emerald lacks any interest in this litigation and therefore is not a proper plaintiff.  (*See* Defts.' Prop. FF&CL at 12.)  Given the post-trial submissions regarding the formation of Emerald and its beneficiary, Emerald Investors Trust Ltd., and because the evidentiary record includes documentary evidence of Toms' assignment of his mortgages and notes to Emerald (*see* Pltfs.' Tr. Exhs. P9–P10), it can no longer be disputed that Emerald is the proper plaintiff to sue on the notes and mortgages.

### H.     The Second Mortgage Parity Agreements Do Not Limit Emerald's Judgment on the Notes and Mortgages

47.     Defendants argued in their pre-trial submission that if Emerald recovers anything on the notes and mortgages this recovery must be split evenly among Emerald, Wolff, and Hoffman by operation of the Second Mortgage Parity Agreements, which provided that each partner ranked equally in payment or security on the loans evidenced by the notes and secured by the mortgages.  (*See* Defts.' Tr. Br. at 10; *see also supra* ¶ 11.)  This argument fails, however, as it ignores the fact that Wolff and Hoffman have released their

mortgages and nothing in the Second Mortgage Parity Agreements suggests that they continue to have any relevance following the release of two of the three mortgages subject to them.

I.      **Emerald Is Entitled to Pre-Judgment Interest at the Rate of 12% Per Annum**

1.      **Because Defendants Breached the MMAs, Emerald Is Entitled to Pre-Judgment Interest Equal to the Rate of Interest Stated on Its Notes**

48.     Emerald claims that it is entitled to pre-judgment interest at the rate set forth in its notes (12%) running from the date of their maturity to the date of any judgment entered herein. (*See* Pltf.'s Prop. FF&CL at 19.)  The Court agrees, for the reasons set forth herein, that Emerald is entitled to pre-judgment interest at this rate.

49.     The parties agree that New Jersey law governs this issue.  (*See* Pltf.'s Prop. FF&CL at 19; Brief in Support of Defendants' Cross Motion for Summary judgment at 40–41 [hereinafter "Defts.' SJ Br."];) *see also Jarvis v. Johnson*, 668 F.2d 740, 746 (3d Cir. 1982) ("[S]tate prejudgment interest rules are to be applied in diversity cases.").  Under New Jersey law, "[i]nterest does not run on liquidated claims [such as this one] as a matter of course, but [is awarded at the Court's discretion] in accordance with principles of equity." *Bak-A-Lum Corp. of Am. v. Alcoa Bldg. Prods., Inc.*, 351 A.2d 349, 353 (N.J. 1976); *see also Lautek Corp. v. Image Bus. Sys. Corp.*, 648 A.2d 488, 498 (N.J. App. Div. 1994).

50.     Pre-judgment interest is regarded as a compensatory measure designed to "indemnify the plaintiff for the loss of what the monies due him would presumably have earned if payment had not been refused."  *Rova Farms Resort v. Investors Ins. Co.*, 323 A.2d 495, 506 (N.J. 1974).  Accordingly, "[t]he issue is not whether the plaintiff can prove a loss by virtue of having had to pay interest to get the money or by having lost interest from a bank account or investment through removal of the sum therefrom.  The loss, rather, is assumed.  The basic consideration is that the defendant has had the use, and the plaintiff has not, of the amount in question; and the interest factor simply covers the value of the sum awarded for the prejudgment period during which the defendant had the benefit of monies to which the plaintiff is found to have been earlier entitled." *Id.* (citations omitted).  In this case, there is no doubt that GPP and 99 CHA (or 119 CHA and Horseheads) had use of the $2,659,994.65 in net proceeds from the sale of the 99 Cherry Hill Road and 119 Cherry Hill Road properties, which proceeds were used to pay off general creditors and to secure the additional debt placed on Horseheads' property in order to make the 1998 sale palatable to UBK.  (*See supra* ¶ 18.)  Moreover, there is no doubt that Emerald did not have use of the net proceeds.  Thus, the Court finds that an award of pre-judgment interest would be equitable.

51.     Although an award of pre-judgment interest would be equitable, the Court in exercising

its discretion in this area is not at liberty to fix whatever pre-judgment interest rate it likes. Emerald calls the Court's attention to a Third Circuit case, *Mid-Jersey National Bank v. Fidelity-Mortgage Investors*, 518 F.2d 640, 645 (3d Cir. 1975), applying New Jersey law and stating that "for the rate of pre-judgment interest to be equitable it should reflect the rate fixed by the parties in an arm's length transaction." In *Mid-Jersey*, an action to recover on an unpaid promissory note, the Third Circuit concluded that any pre-judgement interest rate should correspond to the interest rate set forth in any relevant unpaid promissory note, stating that it "would be proper to allow the contractual rate of interest to continue in effect until judgment." *Id*. Based on this precedent, Emerald contends that "the rate fixed by the parties" was 12% per annum—the rate stated on each note and which Emerald contends is applicable as a result of Defendants' breach of the MMAs. The Court agrees that the 12% is appropriate given Defendants' breach of the MMAs—that is, Defendants' failure to satisfy Emerald's notes and mortgages in December 1999 out of the net proceeds from the 1998 sale of the properties and their failure to satisfy their Prepayment obligations.

52.  That Defendants breached their Prepayment obligations cannot be disputed. As was made clear during summary judgment briefing, the MMAs required that the fourth and final "prepayment" installments be made by April 1, 1999, with a five day period for cure. (*See also* Pltf.'s Tr. Exhs. 32–33, at § 2.) Emerald was not tendered checks, however, until April 26, 1999. (*See* Plaintiff's Memorandum of Law In Support of Motion for Summary Judgment at 5, 13; Defts.' SJ Br. at 18–21, 25–27.)

53.  But Defendants' failure to timely meet their Prepayment obligations was not their most egregious breach of the MMAs. The MMAs clearly required Defendants to satisfy Emerald's notes and mortgages out of any net proceeds derived from any sale of the properties. (*See supra* ¶ 13.) The MMAs also clearly incorporated by reference the obligation stated in the notes that Defendants make payment on them on or before December 1999. (*See id*.) Thus, when Defendants failed to make payment on the notes in December 1999 despite having realized $2,659,994.65 in net proceeds from the sale of the properties, this *too* resulted in Defendants' losing the benefit of the bargain struck under the MMAs. Defendants having thus breached the MMAs—a breach the Court considers more significant than Defendants' failure to meet their Prepayment obligations—the Court fails to see how Defendants may now be allowed the benefit of the modifications set forth in the MMAs. Were the Court to allow this, it would be adopting a reading of the agreements that could conceivably allow Defendants to withhold payment on the notes indefinitely without thereby incurring the contractually contemplated penalty (nullification of the modifications) for such a default. The Court will not do so here.

54.  In light of these breaches of the MMAs, and considering the negotiated nature of the notes and mortgages (*see supra* ¶ 10), under *Mid-Jersey* this is the rate of pre-judgment interest to which the Court, in its discretion, find Emerald is now entitled. Given the facts of this case, this is certainly the equitable rate. *See Shadow Lawn Sav. and Loan*

*Ass'n v. Palmarozza*, 463 A.2d 384, 388 (N.J. App. Div. 1983) (adopting *Mid-Jersey* and stating that "[w]hen the legal rate [of pre-judgment interest] is less than the contract rate it may be equitable to allow interest to run on the judgment at the contract rate to avoid prejudice to a mortgagee caused by delays in satisfying the judgment").

### 2.   The Finding That Defendants Breached the MMAs Is Consistent with the Court's Adjudication of the Parties' Summary Judgment Motions

55.   Nothing in the adjudication of this case thus far precludes this finding, as the Court has never held that the MMAs *were not* breached. On summary judgment, the Court construed Emerald's motion as seeking foreclosure on the basis of Defendants' breach of their Prepayment obligations under the MMAs alone. The issue resolved by the Court at that time, therefore, was "whether Defendants' default [of their Prepayment obligations] is sufficient to grant the remedy of foreclosure." *See* Opinion accompanying Order dated August 30, 2004 at 8. The Court concluded that "Defendants' default in respect to the late payments does not [justify] ordering foreclosure on the two properties" because any breach by Defendants of their Prepayment obligations was "*de minimus*" and otherwise "cured." *See id*. Nothing in this Court's disposition of the parties' cross motions for summary judgment indicates, however, that the Court decided that Defendants' multiple breaches of the MMAs were "cured" or otherwise rendered inconsequential for purposes of the modifications stated in the MMAs (specifically, the modifications that rendered the notes non-interest bearing, reduced their face values from $583,333.33 to $250,000.00, and provided for repayment thereon only, in relevant part, to the extent of that any refinancing or sale of the properties securing them resulted in any net proceeds). In fact, the case relied upon by the Court in this portion of its summary judgment opinion, *Kaminski v. London Publishing, Inc*., 301 A.2d 769 (N.J. App. Div. 1973), held nothing more than that a court sitting in equity need not order foreclosure on a mortgage based solely on a default of a mortgage condition where such a result would be harsh.

56.   Certainly, a holding by this Court that any breach of the MMAs was inconsequential would have been unsupported by the papers submitted on the parties' cross motions for summary judgment, which indicate that the defenses asserted with respect to Defendants' breach of their Prepayment obligations were inappropriate for summary judgment. Specifically, Defendants argued on summary judgment that waiver and accord and satisfaction bar Emerald from now claiming that they breached their Prepayment obligations. (*See* Defts.' SJ Br. at 25–27.) In support of their waiver argument, Defendants pointed out that Emerald ultimately accepted their tardy final prepayment installment. (*Id*.) Given the May, July, and September 2000 letters from Emerald to Defendants (submitted by the parties in connection with their summary judgment briefing) expressing Emerald's belief that Defendants were nonetheless in default of their Prepayment obligations under the MMAs, however, Emerald's ultimate acceptance of payment hardly demonstrates that no triable issue of fact existed as to this defense—specifically, as to whether Emerald subjectively intended to relinquish a known right. *See Petrillo v. Bachenberg*, 623 A.2d 272, 276 (N.J. App. Div. 1993) (observing

that waiver is not a question of objective intent and that waiver results only if the "party charged with the waiver knew of his or her legal rights and deliberately intended to relinquish them").  Nor could the Court have concluded on summary judgment that accord and satisfaction rendered Defendants' breach of their Prepayment obligations inconsequential because, as pointed out in Emerald's opposition brief, that affirmative defense was not pleaded in Defendants' Answer nor have Defendants ever sought to amend their Answer to include this affirmative defense.  *See* Fed. R. Civ. P. 8(c) ("In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction . . . and any other matter constituting an avoidance or affirmative defense."); *Albee Homes Inc. v. Lutman*, 406 F.2d 11, 13 (3d Cir. 1969) (noting that failure to plead an affirmative defense results in a waiver of that defense unless the party is allowed to amend its pleading).

57.     Defendants' opposition to Emerald's motion for reconsideration of the Court's summary judgment opinion indicates that Defendants understood the limited basis of the Court's ruling: "Judge Martini's denial of plaintiff's motion for summary judgment means that defendant's three-week 'default' in installment payments did not automatically justify the extremely harsh foreclosure plaintiff sought."  (*See* Defendants' Opposition to Plaintiff's Motion for Reargument and Reconsideration of the Court's August 30, 2004 Opinion at 6.)

58.     That the Court on summary judgment did not resolve the disputed issue of whether Defendants may be deemed to have breached the MMAs is consistent with the outstanding legal issues identified by the parties in Part 9 of the Final Pre-Trial Order, which identifies the following:

   a.      "Whether the Court's summary judgment and reconsideration opinions are the law of this case."
   b.      "Whether there are any monies due Emerald under the mortgage documents."
   c.      "Whether the Mortgage Modification Agreements defeat plaintiff's Complaint."
   d.      "Whether equitable defenses of . . . accord and satisfaction, . . . waiver, . . . and *de minimus* bar foreclosure."
   e.      "Whether defendants defaulted on the mortgage documents."

59.     It is also consistent with the disputed issues of fact identified by the parties in Part 4 of the Final Pre-Trial Order.  In it, Emerald made the factual contention—disputed by Defendants—that the modifications stated in the MMA were nullified upon Defendants' breach of their Prepayment obligations and that as a result of Defendants' late payment Defendants now owe Emerald $583,333.33 on each note with 12% pre-judgment interest thereon.  (*See* Final PTO, Part 4, ¶¶ h–i, o at pp.11, 13.)  Accordingly, Defendants set forth facts—which Emerald disputed—that could conceivably support Defendants' waiver and accord and satisfaction affirmative defenses.  (*See id*. ¶¶ mm–rr, at pp.26–27.) Indeed, Defendants stated therein that "[t]his case concerns the fourth and final Mortgage

Modification Agreement Prepayment Amount . . . ."  (*Id.* ¶ mm, at 26.)

### 3.    Defendants Introduced No Evidence to Support Their Affirmative Defenses Regarding Defendants' Breach of the MMAs

60.    Despite this listing of trial issues and disputed facts and although Defendants previously argued in their summary judgment papers that waiver and accord and satisfaction bar any claim that Defendants defaulted on their Prepayment obligations under the MMAs, Defendants introduced no evidence to support these affirmative defenses—for which they bore the burden of proof—at trial.  Indeed, they did not even address them in their post-trial submissions.  To the extent that they are mentioned in Defendants' pre-trial submission, they are mentioned there only in the context of Defendants' contention that Defendants are not barred from raising these affirmative defenses at trial.  (*See* Defts.' Tr. Br. at 11–12.)

61.    Given Defendants' breach of the MMAs (by their failure to satisfy Emerald's notes and mortgages in December 1999 out of the net proceeds from the 1998 sale of the properties and by their failure to satisfy their Prepayment obligations) and their failure to support these affirmative defenses at trial, there is no reason for the Court to doubt that the equitable pre-judgment interest rate—"the rate fixed by the parties in an arm's length transaction"— is 12%.

### K.    The Amount Due On Each Note Is $583,333.33

62.    In light of the Court's finding that Defendants breached the MMAs, as describe *supra*, it is clear that the modifications stated in the MMAs reducing the face value of each note from $583,333.33 to $250,000.00 and limiting Emerald's recovery to its equal one-third share of any net proceeds derived from the sale of the properties securing the notes are nullities.

IV.     CONCLUSION

      For the reasons stated herein, the Court will enter judgment in Emerald's favor in the amount of $583,333.33 on each note and will award pre-judgment interest at the rate of 12% per annum.  The Court also will enter judgment of foreclosure in Emerald's favor.  Accordingly, and as indicated in the accompanying Order, the Court directs Emerald to submit within 14 days of this Order a Proposed Order consistent with this Opinion.  In connection with submitting its Proposed Order, Emerald should submit a schedule setting forth its computation of the amount of pre-judgment interest included in the Proposed Order.


                            s/ William J. Martini                
                            **William J. Martini, U.S.D.J.**

cc:    The Honorable Ronald J. Hedges, U.S.M.J.